UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| ANASTAISA RENEE also known as ELMER D. CHARLES, JR., <br><br> Plaintiff, <br><br> v. <br><br> RON NEAL, et al., <br><br> Defendants. | CAUSE NO.: 3:18-CV-592-RLM-MGG |

OPINION AND ORDER

Anastaisa Renee, also known as Elmer D. Charles, Jr., a prisoner without a lawyer, brings this action under 42 U.S.C. § 1983. Ms. Renee was born a male but identifies as a female.[1] She is proceeding on First and Eighth Amendments claims against Ron Neal, the Warden of Indiana State Prison and Robert Carter, Jr., the Commissioner of the Indiana Department of Correction. The court granted her leave to proceed on three claims: (1) a claim against both defendants for subjecting her to unduly harassing strip searches in violation of the Eighth Amendment; (2) a claim against both defendants for violating her First Amendment right to free expression by refusing to let her purchase makeup and other commissary items that are available at women's correctional facilities; and (3) a claim against both defendants for refusing to approve her for gender

---

[1] Ms. Renee attests that she was granted a gender marker change in state court in September 2019, after this lawsuit was filed. (ECF 80 at 2.) Out of respect, the court uses her preferred female name and female pronouns throughout this opinion.

reassignment surgery in violation of the Eighth Amendment. She seeks monetary damages and injunctive relief.

The defendants now move for partial summary judgment in their favor.[2] (ECF 72.) Commissioner Carter moves for summary judgment on Ms. Renee's strip search claim against him for monetary damages, arguing that he wasn't personally involved in the events underlying that claim. Both defendants move for summary judgment on Ms. Renee's First Amendment claim related to the commissary items and her Eighth Amendment claim related to her need for gender reassignment surgery. They argue that Commissioner Carter wasn't personally involved in the events underlying these claims and, even if he was, both defendants are entitled to qualified immunity on these claims. (*Id.* at 6-11.)

Ms. Renee filed a response and supporting documents in opposition to summary judgment.[3] The defendants filed a reply, and Ms. Renee filed a sur-reply. The defendants separately moved to strike two affidavits Ms. Renee submitted in opposition to summary judgment. These matters are now ripe for adjudication.

Before turning to the facts, the court addresses the motion to strike. Ms. Renee submitted two affidavits in opposition to summary judgment: a form

---

[2] The defendants served Ms. Renee with the notice required by N.D. Ind. L.R. 56-l(f).

[3] The defendants read certain statements in Ms. Renee's response as indicating that she is improperly moving for summary judgment in her favor without complying with court-imposed deadlines, the Federal Rules of Civil Procedure, or the Local Rules of this court. (ECF 82.) As this court reads her filing, she is asking for a ruling in her favor on Defendants' motion for summary judgment—in other words, that the motion be denied. She clarifies in her sur-reply that this is what she intended.

affidavit included in her "Designation of Evidence," and a separately filed, handwritten affidavit. The defendants move to strike both documents.

Why Ms. Renee submitted two separate affidavits is unclear. The form affidavit is quite brief and consists mainly of boilerplate. As for the language she wrote in, she attests simply that "all statement in civil rights complaint is true," that "all sexual abuse did happen," and "that Ron Neal was contacted on all offenses and that after gender change Ron Neal forced Plaintiff as a male when she's a female." As the defendants point out, this document wasn't signed under penalty of perjury as required by 28 U.S.C. § 1746; indeed, the document isn't signed at all. Given that the affidavit is unsigned and appears incomplete, the court will strike this document.

The defendants argue that the other affidavit contains statements that are not based on personal knowledge, pertain to matters on which Ms. Renee isn't competent to testify, and consists of legal conclusions rather than specific facts that would be admissible in evidence. The court agrees that paragraphs 1, 2, 3, 6, 7, 8, and 9 contain legal conclusions, personal opinions rather than facts, and matters on which Ms. Renee would not be competent to testify as a lay person. *See* FED. R. CIV. P. 56(c)(4); Greene v. Westfield Ins. Co., 963 F.3d 619, 627 (7th Cir. 2020) (observing that "affidavits are for stating facts, not legal conclusions"). She also includes matters outside the scope of this lawsuit, including her desire to be transferred to a women's prison and issues related to her underlying conviction. Nevertheless, because Ms. Renee is proceeding without counsel, the court must liberally construe all of her filings. Erickson v. Pardus, 551 U.S. 89,

94 (2007). Given her *pro se* status, the court declines to strike the affidavit and will instead simply disregard the inappropriate material it contains. *See* Pfeil v. Rogers, 757 F.2d 850, 862 (7th Cir. 1985) (noting that "legal argument in an affidavit may be disregarded"). The court has also disregarded general assertions in her affidavit that conflict with specific testimony she gave during her sworn deposition. *See* Cook v. O'Neill, 803 F.3d 296, 298 (7th Cir. 2015); Pourghoraishi v. Flying J, Inc., 449 F.3d 751, 759 (7th Cir. 2006).

## I.   FACTS

Ms. Renee has been diagnosed with gender dysphoria,[4] for which she has received estrogen therapy at Indiana State Prison since 2014. She also receives mental health counseling. None of her prison medical providers have recommended gender reassignment surgery.[5] She has filed multiple grievances requesting gender reassignment surgery, which were all denied.

On October 26, 2017, Ms. Renee wrote Commissioner Carter a letter complaining about strip searches of prisoners working in the kitchen at ISP, where she worked from October 2017 to January 2018. She said in the letter that she is "intersex" and has "female breasts," and that due to the strip

---

[4] Gender dysphoria is "an acute form of mental distress stemming from strong feelings of incongruity between one's anatomy and one's gender identity." Campbell v. Kallas, 936 F.3d 536, 538 (7th Cir. 2019).

[5] No outside doctor has recommended such treatment either. Ms. Renee testified that approximately 20 years ago, prior to her incarceration, she consulted a doctor about gender reassignment surgery, and he told her "[o]nce you go on hormones for two years, we will consider it." (ECF 73-2 at 45.) He retired before she could pursue the matter further. (*Id.*)

4

searches, she was "forced to expose [her] breast to 1-2 males everyday," which she deemed "sexual harassment." (ECF 73-3 at 2.) She suggested that if the prison was looking for drugs, "why not bring the dog?" (*Id.*) She further stated that she thought the searches presented a "no-win situation," because if the kitchen workers didn't traffic drugs, others in the facility would still do so. She further complained that when "male officers pat search me they keep touching my breast and the superintendent isn't doing nothing about it." (*Id.* at 3.) She asked that only female correctional officers be allowed to search her. On November 14, 2017, the Department of Correction's Regional Executive Director, Michael Osburn, responded to Ms. Renee's letter, stating that there was a policy that "all [kitchen] workers be strip searched as a step toward lowering the ability to traffic," and that "[p]art of a pat down includes the Officer patting down the breast area." (ECF 73-3 at 1.) He said that, based on her letter, he didn't think anything improper had occurred.

Beginning in April 2016, Ms. Renee submitted multiple grievances complaining that she was being denied "the ability to purchase all items allowed to women," including makeup, female hygiene products, and female underwear. (ECF 73-4; ECF 81 at 3-23.) The grievances were denied because Warden Neal decided in December 2015 to allow Ms. Renee to wear a bra, but not to possess additional items like makeup and female underwear. Ms. Renee had no direct

contact with Commissioner Carter about being denied female commissary items.[6]

## II.   ANALYSIS

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Daugherty v. Page, 906 F.3d 606, 610 (7th Cir. 2018) (citation omitted). In deciding whether a genuine dispute of fact exists, the court must "consider all of the evidence in the record in the light most favorable to the non-moving party, and . . . draw all reasonable inferences from that evidence in favor of the party opposing summary judgment." Dunn v. Menard, Inc., 880 F.3d 899, 905 (7th Cir. 2018) (citation omitted).

At the summary judgment stage, the court cannot "weigh conflicting evidence" or "make credibility determinations," as both of these functions "are the province of the jury." Omnicare, Inc. v. UnitedHealth Grp., Inc., 629 F.3d 697, 704-05 (7th Cir. 2011) (citations omitted). Instead, the court's only task is "to determine whether there is a genuine issue for trial." Tolan v. Cotton, 572 U.S. 650, 657 (2014) (citation omitted).

---

[6] Ms. Renee acknowledges in her sur-reply that she "did not contact the Commissioner Robert Carter on any issue except the strip searches." (ECF 84 at 1.)

A. Strip Searches

Ms. Renee first asserts that both defendants subjected her to unduly harassing strip searches in violation of the Eighth Amendment. Commissioner Carter moves for summary judgment on the part of the claim seeking monetary damages against him, arguing that he wasn't personally involved in the events underlying the claim.

A violation of the Eighth Amendment consists of two elements: (1) the injury must be objectively serious enough to have deprived the inmate of the minimal civilized measure of life's necessities, and (2) the prison official must have acted with deliberate indifference to the inmate's health or safety. Farmer v. Brennan, 511 U.S. 825, 834 (1994). "There is no question that strip searches may be unpleasant, humiliating, and embarrassing to prisoners, but not every psychological discomfort a prisoner endures amounts to a constitutional violation." Calhoun v. DeTella, 319 F.3d 936, 939 (7th Cir. 2003). Strip searches are generally permissible in the prison context if conducted for a legitimate penological reason. See Florence v. Bd. of Chosen Freeholders of Cty. of Burlington, 566 U.S. 318, 330 (2012); Calhoun v. DeTella, 319 F.3d at 939. However, a strip search will violate the Eighth Amendment if it is "totally without penological justification" or "conducted in a harassing manner intended to humiliate and inflict psychological pain." Calhoun v. DeTella, 319 F.3d at 939.

For a defendant to be held liable under section 1983, he must have been personally involved in the violation of the plaintiff's constitutional rights. Mitchell

v. Kallas, 895 F.3d 492, 498 (7th Cir. 2018). A high-ranking prison official can't be held liable under 42 U.S.C. § 1983 simply because he oversees operations within the prison or supervises other correctional staff. Burks v. Raemisch, 555 F.3d 592, 596 (7th Cir. 2009). A defendant will be deemed to have sufficient personal responsibility for a constitutional violation if the violation occurred "at a defendant's direction" or with his "knowledge or consent." Mitchell v. Kallas, 895 F.3d at 498.

It's not entirely clear who first ordered the strip searches,[7] but the uncontradicted evidence in the record shows that the policy was adopted to combat drug trafficking at the state prison and that it applied to all kitchen employees. There was nothing improper about a general strip search policy, nor is there any indication that Commissioner Carter directed correctional staff to conduct the searches in an unduly harassing manner. Indeed, Ms. Renee testified at her deposition that the policy was "not the problem." (ECF 73-2 at 19.) In her view, "[t]he problem is the way the officers acted inside the bathroom" when they were conducting the searches.[8] (Id.) The conduct Ms. Renee attributes to the individual officers conducting the searches was unprofessional, but Commissioner Carter cannot be held liable for their misdeeds simply because he oversees operations within the IDOC. Burks v. Raemisch, 555 F.3d at 596.

---

[7] Ms. Renee's deposition testimony suggests that it was Deputy Warden Payne, a non-party, who first ordered the strip searches, rather than either of the defendants.

[8] Ms. Renee testified at her deposition that the officers would "laugh," "joke," or "giggle" when deciding who would conduct the searches and during the searches themselves, and would sometimes leave the door open or push another officer into the bathroom when the search was being conducted, which she deemed "unprofessional." (ECF 73-2 at 21, 24.)

Ms. Renee's deposition testimony reflects that her only direct contact with Commissioner Carter about this issue was the single letter she sent him, which complained about the strip searches of kitchen staff generally. Ms. Renee acknowledged at her deposition that the letter was "simply complaining about the strip searches, not in detail because . . . they usually read the stuff that goes out if it's not legal, . . . so I just wrote it brief." (ECF 73-2 at 28.) The primary complaint she identified in the letter was that the searches were unnecessary because no drugs had been found among ISP's kitchen staff. Although she said that officers were touching her breast area during pat-down searches, there is nothing inherently improper about such conduct in the prison setting. *See* United States v. Waldman, 835 F.3d 751, 756 (7th Cir. 2016); Washington v. Hively, 695 F.3d 641, 643 (7th Cir. 2012). Critically, the letter didn't alert Commissioner Carter that the officers were conducting the pat-down searches in a manner that was unduly harassing or unrelated to legitimate penological concerns. Based on the record, Commissioner Carter is entitled to summary judgment on this claim.

B. Commissary Items

Ms. Renee next alleges that both defendants violated her First Amendment right to free expression by denying her items that were available at the commissary in women's prisons. At her deposition, Ms. Renee clarified that she wanted to have feminine "deodorant, body washes, . . . cosmetics, face masks, . . . lady razors, Nair," and similar items. (ECF 73-2 at 33-34.) She acknowledged that Warden Neal let her to purchase bras, and that it was he who prevented her

9

from having the other items. She had no direct contact with Commissioner Carter about this matter. There is nothing to suggest that Commissioner Carter had any personal involvement in the events underlying this claim, and as already explained, he can't be held liable for damages just because he oversees operations within the IDOC or supervises other correctional staff. Burks v. Raemisch, 555 F.3d at 596. Commissioner Carter is entitled to summary judgment on this claim.

Alternatively, both defendants argue that they are entitled to qualified immunity on this claim. "Under the doctrine of qualified immunity, government officials are liable for civil damages . . . only when their conduct violated clearly established statutory or constitutional rights of which a reasonable person would have known." Balsewicz v. Pawlyk, 963 F.3d 650, 656 (7th Cir. 2020) (citations and internal quotation marks omitted). The doctrine "protects all but the plainly incompetent or those who knowingly violate the law." Campbell v. Kallas, 936 F.3d 536, 546 (7th Cir. 2019) (citation omitted). In evaluating a qualified immunity defense at summary judgment, the court considers (1) whether the facts, taken in the light most favorable to the plaintiff, show that the official violated a clearly established right; and (2) whether the plaintiff has come forward with sufficient evidence to create a genuine dispute of fact as to whether the official in fact committed those acts. Balsewicz v. Pawlyk, 963 F.3d at 656.

"A right is clearly established when existing precedent has placed the statutory or constitutional question beyond debate." Howell v. Smith, 853 F.3d 892, 897 (7th Cir. 2017) (citation and internal quotation marks omitted). The

"focus is on whether the [defendant] had fair notice that his conduct was unlawful." Balsewicz v. Pawlyk, 963 F.3d at 656-57 (citation, internal quotations marks, and alteration omitted). "Put another way, if applying the law at that time to the facts would have left objectively reasonable officials in a state of uncertainty, then immunity is appropriate." *Id.* (citation and internal quotation marks omitted); *see also* Campbell v. Kallas, 936 F.3d at 546 (observing that "a right is clearly established only if every reasonable official would have understood that what he is doing violates that right" (citation and internal quotation marks omitted)). Thus, "clearly established law cannot be framed at a high level of generality." Balsewicz v. Pawlyk, 936 F.3d at 545 (citation omitted).

An inmate generally "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." Pell v. Procunier, 417 U.S. 817, 822 (1974). By the same token, "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979). "[M]aintaining institutional security and preserving internal order are essential goals that may require limitation or retraction of the retained constitutional rights[.]" *Id.*

Little case law, either within the Seventh Circuit or outside it, addressing the First Amendment rights of transgender inmates to wear makeup or female clothing. The few courts to have considered the issue have held that transgender inmates don't have a First Amendment right to wear makeup or women's

11

clothing. *See* Jones v. Warden of Stateville Corr. Ctr., 918 F. Supp. 1142, 1146 (N.D. Ill. 1995) (rejecting as frivolous transgender inmate's First and Fourteenth Amendment claims based on the denial of access to female underwear and lipstick); Star v. Gramley, 815 F. Supp. 276, 278 (C.D. Ill. 1993); *see also* Hood v. Dep't of Children & Families, No. 2:12-CV-637-FTM-29, 2015 WL 686922, at *3 (M.D. Fla. Feb. 18, 2015) ("[T]he Court has no found authority indicating that a transgender person has the right to choose the clothing worn while confined or that the facility is constitutionally obligated to purchase all the clothing and feminine products requested.").

Some circuits, including ours, have analyzed this type of claim under the Eighth Amendment, but have held that denying transgender inmates makeup and similar items did not violate the Constitution. *See* Campbell v. Kallas, 936 F.3d at 549 ("As for Campbell's requests for electrolysis and makeup, our cases offer no indication that denying arguably nonmedical cosmetic accommodations [to transgender inmates] violates the Eighth Amendment."); *see also* Keohane v. Fla. Dep't of Corr. Sec'y, 952 F.3d 1257, 1275 (11th Cir. 2020) (denial of transgender inmate's request for "social-transitioning" items like makeup did not show deliberate indifference); Murray v. U.S. Bureau of Prisons, 106 F.3d 401 (6th Cir. 1997) (rejecting transgender inmate's Eighth Amendment claim based on denial of makeup and female hygiene products, because "[c]osmetic products are not among the minimal civilized measure of life's necessities"). At least one court has recognized the "serious security concerns" posed by requests like Ms. Renee's, namely, "that an inmate dressed and groomed as a female would

12

inevitably become a target for abuse in an all-male prison."[9] <u>Keohane v. Florida D.O.C.</u>, 952 F.3d at 1275. Because there is no case law that would have put defendants on notice that Ms. Renee had a clearly established First Amendment right to wear makeup and purchase female hygiene items, the defendants are entitled to qualified immunity on this claim.

The court doesn't intend to minimize the comfort such items might bright to one with gender dysphoria who identifies as female. But the defendants are correct that what Ms. Renee presents is not a clearly established federal constitutional right.

### C. Gender Reassignment Surgery

In her final claim, Ms. Renee asserts that both defendants violated her Eighth Amendment rights by denying her requests for gender reassignment surgery. As already recounted, Ms. Renee has been receiving hormone therapy at ISP for several years, and also receives mental health counseling. She has been permitted to wear a bra as an accommodation. None of her prison medical providers have recommended gender reassignment surgery, nor has she named any of her medical providers as defendants in this case. Instead, she sues two high-ranking Department of Correction officials for denying her grievances requesting gender reassignment surgery. They argue that they are entitled to qualified immunity on this claim.

---

[9] Ms. Renee argues in some of her filings that she should be transferred to a women's prison now that she has been granted a gender marker change by the state court, but such a claim falls outside the scope of the screening order. Ms. Renee recently filed a new case, <u>Renee v. Holcomb</u>, 3:20-cv-599-DRL-MGG, in which she challenges the IDOC's denial of her formal request for a transfer to a women's prison. That case remains in the preliminary stages.

In 2019, after the events giving rise to this case, the court of appeals held that "no case clearly establishes that denying treatment [for gender dysphoria] beyond hormone therapy is unconstitutional[.]" Campbell v. Kallas, 936 F.3d at 549. Nor did the court recognize such a right in that case. Instead, the court held that "prisons aren't obligated to provide every requested treatment once medical care begins." *Id.* The question of deliberate indifference turns on the "discrete treatment decisions" made in a given case. *Id.* Circuit precedent has long established that "a total absence of treatment for the serious medical needs created by gender dysphoria is unconstitutional," Mitchell v. Kallas, 895 F.3d at 499, but Ms. Renee's gender dysphoria hasn't been left untreated. She is receiving hormone therapy, counseling, and has been permitted certain non-medical accommodations. None of her prison medical providers have recommended gender reassignment surgery; indeed, prevailing medical standards recognize that gender reassignment surgery "is the last and the most considered step in the treatment process," and "not all gender-dysphoric patients are surgical candidates." Campbell v. Kallas, 936 F.3d at 539 (citation omitted). Denying a request for gender reassignment surgery "is not the same as deciding to provide no treatment at all," particularly because this "course of treatment poses considerable challenges to prison administration." *Id.* Based on the case law and the record evidence, the defendants are entitled to qualified immunity on this claim.

## III.   CONCLUSION

For these reasons, the defendants' motion to strike (ECF 83) is GRANTED in part and DENIED as stated herein. Defendants' motion for partial summary judgment (ECF 72) is GRANTED. Defendants are entitled to summary judgment on Ms. Renee's First Amendment claim and her Eighth Amendment claim seeking gender reassignment surgery. Commissioner Carter is also entitled to summary judgment on Ms. Renee's Eighth Amendment claim against him for money damages related to the strip searches. What remains of the case, then, is Ms. Renee's Eighth Amendment claim against Warden Neal for money damages pertaining to the strip searches, and her official capacity claims against both defendants seeking injunctive relief related to the searches. Neither party has moved for summary judgment on these claims, and so they must be resolved at trial.

SO ORDERED on September 2, 2020

s/ Robert L. Miller, Jr.
JUDGE
UNITED STATES DISTRICT COURT